CUAUHTEMOC ORTEGA (Bar No. 257443)
Federal Public Defender
IJEOMA U. EKE (Bar No. 331938)
(E-Mail: Ijeoma_Eke@fd.org)
Deputy Federal Public Defender
321 East 2nd Street
Los Angeles, California 90012-4202
Telephone: (213) 894-3107
Facsimile: (213) 894-7556

Attorneys for Defendant
Joe Guzman

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**WESTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>JOE GUZMAN,<br><br>Defendant. | Case No. CR 21-77-RGK<br><br>**DEFENDANT JOE GUZMAN POSITION RE: SENTENCING**<br><br>Hearing Date: March 14, 2022<br>Hearing Time: 10:00 a.m. |

Defendant Joe Guzman, by and through his attorney of record, Deputy Federal Public Defender Ijeoma U. Eke, hereby files this sentencing position.

Respectfully submitted,

CUAUHTEMOC ORTEGA
Federal Public Defender

DATED: March 4, 2022 By */s/ Ijeoma U. Eke*

IJEOMA U. EKE
Deputy Federal Public Defender
Attorney for Joe Guzman

## I. INTRODUCTION

Joe Guzman's life has been anything but easy. Mr. Guzman grew up in Santa Maria, California where gangs and drugs were not only prevalent but a part of his home life. The majority of Mr. Guzman's family was involved in gangs and his parents both struggled with drug addictions. As a result, it was not long before Mr. Guzman followed in their footsteps. The result is documented in the Presentence Investigation Report ("PSR")—involvement in the criminal justice system beginning when he was only fifteen years old.

However, Guzman knows he can do better and is motivated to do so. He understands that the way he has been living only causes pain for him and those who love him. Mr. Guzman is determined to turn his life around so that he can be a role model for his children but most importantly, provide the stability for his family that he lacked growing up. In light of the mitigating factors outlined below, Mr. Guzman respectfully requests a sentence of 120 months and 5 years of supervised release.

## II. THE PRESENENCE INVESTIGATION REPORT

The PSR has determined Mr. Guzman's overall offense level to be 27 and criminal history category to be V, with a resulting guideline range of 120 to 150 months imprisonment. *See* PSR ¶ 84. The defense does not object to the mechanical calculation of the guidelines.

## III. APPLICATION OF SECTION 2D1.1 RESULTS IN UNREASONABLE SENTENCING RANGES

The Court should lend little weight to the guideline range in Mr. Guzman's case, which is driven by the quantity of Ice methamphetamine—a mixture containing d-methamphetamine hydrochloride of at least 80% purity. U.S.S.G. § 2D1.1(c)(2); U.S.S.G. § 2D1.1(c), Note (C) to the Drug Quantity Table. Various courts have recently questioned the validity of the 10-to-1 ratio between the guideline ranges for Ice or actual methamphetamine and the ranges for a methamphetamine mixture. *See United*

*States v. Nawanna*, 321 F. Supp. 3d 943, 945 (N.D. Iowa 2018); *United States v. Harry*, 313 F. Supp. 3d 969, 973-75 (N.D. Iowa 2018); *United States v. Ibarra-Sandoval*, 265 F. Supp. 3d 1249, 1252-54 (D.N.M. 2017); *United States v. Hayes*, 948 F. Supp. 2d 1009 (N.D. Iowa 2013); *United States v. Bean*, No. 18-cr-057-03-LM, 2019 WL 1003338, at *1-8 (D.N.H. Mar. 1, 2019*); United States v. Pereda*, No. 18-cr-00228-CMA, 2019 WL 463027, at *1-6 (D. Colo. Feb. 6, 2019); *United States v. Hartle*, No. 4:16-cv-233-BLW, 2017 WL 2608221, at *1 (D. Idaho June 15, 2017). The rationale running through these cases is that because methamphetamine today is uniformly pure, the distinction based on purity is no longer grounded in logic or reality.

When the Commission promulgated the current methamphetamine guidelines, part of the reasoning was that if the drugs were purer, it meant the defendant played a more important role in the drug operation. As the Commission stated: "Since controlled substances are often diluted and combined with other substances as they pass down the chain of distribution, the fact that a defendant is in possession of unusually pure narcotics may indicate a prominent role in the criminal enterprise and proximity to the source of the drugs." *Hayes*, 948 F. Supp. 2d at 1025 (quoting U.S.S.G. § 2D1.1, cmt. n.26(c)) (internal quotation marks omitted).

The Commission's reasoning may have made sense at the time the methamphetamine guidelines were put forward. Given the situation on the ground today, however, the Commission's "assumption regarding the connection between methamphetamine purity and criminal role is divorced from reality." *Ibarra-Sandoval*, 256 F. Supp. 3d at 1255. As one district court opinion explained, "[d]ue to increases in the average purity of methamphetamine sold today, purity is no longer an accurate indicator of a defendant's culpability or role in a drug enterprise and the presumptive purity assigned to untested drugs does not reflect market realities." *Hartle*, 2017 WL 2608221, at *1. In light of the fact that "most methamphetamine seized at all

distribution levels is remarkably pure . . . higher purity is not a good indicator of a defendant's place in the chain of distribution." *Id*. at *3.

Because drug purity is no longer an accurate indicator of a defendant's role in a criminal enterprise, the current methamphetamine guidelines minimize the possibility of individualized sentencing. As another district court opinion explained, "because of the generally very high purity of methamphetamine available today at all levels of the distribution chain, virtually all defendants today face enhanced punishment for a factor present in virtually all methamphetamine cases, not enhanced punishment based on individualized determinations, making the Guidelines purity enhancement excessive." *Nawanna*, 321 F. Supp. 3d at 954.

The Court should take this unwarranted disparity into account and give little weight to the range established by the methamphetamine guidelines. Accordingly, the Court should exercise its discretion, and, in conjunction with relying on the § 3553(a) factors, impose a 120-month sentence of incarceration with 5 years of supervision to follow.

## IV. SENTENCING CONSIDERATIONS UNDER 18 U.S.C. § 3553(A)

### A. The Overarching Principle

What the Supreme Court has described as the "overarching provision" of 18 U.S.C. § 3553(a) is set forth in that provision's very first sentence—that "[t]he court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes [of sentencing]." *Kimbrough v. United States*, 552 U.S. 85, 101 (2007). This description by the Supreme Court makes clear that this "parsimony principle" is not mere precatory language, but is a key—in fact, the key—requirement that a sentence must satisfy. *See also Nelson v. United States*, 555 U.S. 350, 352 (2009) (per curiam) (reaffirming prior opinions stating that guidelines are not to be presumed reasonable); *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008) (en banc) (sentencing guidelines to be given no more weight than any other § 3553(a) factor).

In arriving at the appropriate sentence, § 3553(a) directs the court to consider: (1) the nature and circumstances of the offense, (2) the history and characteristics of the offender (3) the need to impose a punishment that reflects the seriousness of the offense, to promote respect for the law and to provide just punishment for the offense, (4) to afford adequate deterrence, (5) to protect the public from further crimes, (6) to provide the defendant with needed education, vocational training, medical care or other correctional treatment, and (7) the kinds of sentences that are available. 18 U.S.C. § 3553(a)(1), (2). Further, by enacting § 3582, Congress explicitly recognized that imprisonment is "not an appropriate means of promoting correction and rehabilitation." 18 U.S.C. § 3582(a). Additionally, § 3661 provides that "no limitation shall be placed on the information concerning the background, character, and conduct of the person . . . which a court . . . may consider for the purpose of imposing an appropriate sentence." 18 U.S.C. § 3661. Finally, "extraordinary circumstances are not needed to justify a sentence outside the guidelines range." *United States v. Ruff*, 535 F.3d 999, 1002 (9th Cir. 2008).

In sum, in every case, courts must consider all of the statutory factors, not just the guidelines, in arriving at the appropriate sentence. When the factors set forth in 18 U.S.C. § 3553(a) are considered, a sentence of 120 months' imprisonment and 5 years of supervised release is sufficient, but not greater than necessary, to achieve the aims of sentencing.

**B. Mr. Guzman's Personal History and Characteristics (§ 3553(a)(1))**

1. <u>Childhood Struggles</u>

Mr. Guzman was born October 24, 1990 in Santa Maria, California to Kathleen Bagood and Joe Guzman Jr. Growing up, Mr. Guzman was not always shielded from harsh realities. Mr. Guzman was constantly subjected to his parents' marital discord. While Mr. Guzman never witnessed the physical abuse his mother experienced at the hands of his father, he witnessed the constant arguing and the aftereffects of the abuse.

Mr. Guzman's father was an alcoholic and when he would drink, he would become abusive. Mr. Guzman's mother tried to shield Mr. Guzman and his siblings from the abuse but as the oldest child, Mr. Guzman would constantly ask his mother about the abuse even though she would never tell him what his father did. However, Mr. Guzman witnessed his mother repeatedly kick his father out of the house. But, despite the continuous abuse, Mr. Guzman's father would always come back to the home a few days later. This continued until Mr. Guzman's father passed away.

On June 13, 2000, when Mr. Guzman was just ten years old, his father was in a car accident and passed away from his injuries. Mr. Guzman's father was the passenger of the vehicle and the driver, who was a family member, was drunk. Soon after his father's death, his family moved in with his paternal grandparents. However, the death of his father was particularly hard for Mr. Guzman's mother. As a result, Mr. Guzman's mother began abusing alcohol and drugs. Once Mr. Guzman's mother began using drugs, her presence in Mr. Guzman and his siblings' lives was inconsistent, leading to Mr. Guzman's mother leaving her children with their grandparents for over a year and a half. With a spiraling addiction, Mr. Guzman's mother found herself in and out of prison and unable to care for her children.

Life with his grandparents provided Mr. Guzman with the stability he yearned. Mr. Guzman finally found himself in a happy, safe, and loving environment. Mr. Guzman's grandmother became more of a mother to him and his siblings than their own mother. However, that stability was quickly interrupted. After a year and a half of not seeing his mother, Mr. Guzman's mother began to visit Mr. Guzman and his siblings. Mr. Guzman's mother would sometime take Mr. Guzman and his siblings to stay with her. However, when Mr. Guzman and his siblings would stay with their mother, they would bounce between motels or stay with other family members. While with his mother, Mr. Guzman would witness her smoking methamphetamine with her friends. Eventually, Mr. Guzman began using drugs and his life began to spiral. By the

age of thirteen, Mr. Guzman found himself involved with gangs and dedicating all his time to the streets.

2. Mr. Guzman's Substance Abuse History Began at a Young Age

Mr. Guzman's substance abuse history began at the tender age of seven. Mr. Guzman and his cousin found marijuana at a family member's house and tried it. This led to Mr. Guzman smoking marijuana with his friends on the weekend while he was in elementary school. By the age of twelve, Mr. Guzman and his friends would smoke marijuana four to five times every day. At the age of fourteen, Mr. Guzman tried alcohol for the first time. Soon after his first drink, Mr. Guzman started drinking on a daily basis. He would drink any hard liquor that he was able to take from family members or steal from the store. At the age of sixteen Mr. Guzman's drug use escalated and he tried methamphetamine for the first time. Even though he was already around methamphetamine due his mother's drug use, he held off trying it until he was sixteen. Unfortunately, once Mr. Guzman tried methamphetamine, he was hooked. Mr. Guzman began smoking methamphetamine at least five times a day. His spiraling addiction addition corresponded with his involvement in the criminal justice system and persisted until the instant offense. It was under these circumstances that Mr. Guzman committed the instant offense.

Mr. Guzman's chronic use of methamphetamine undoubtedly began impacting his brain. Chronic methamphetamine use can permanently alter the central nervous system.[1] This neuronal death creates significant brain damage.[2] Prolonged use of

[1] *Effects of Crystal Meth on the Brain and Central Nervous System*, American Addiction Centers, https://americanaddictioncenters.org/meth-treatment/effects-on-the-brain-and-cns. (Last visited March 4, 2022).

[2] *Id*.

methamphetamine can result in loss of motor control, memory loss, and learning.[3] Most notably, methamphetamine effects the frontal and prefrontal cortex of the brain—areas that are responsible for cognition, reasoning, complex attention, problem-solving, and the inhibition of behaviors that might be damaging.[4] In combination with a brain that is still developing, such frontal and prefrontal cortex damage can lead to violent behavior, lack of restraint, and intense emotional reactions.[5] Without the ability to process the consequences of his actions due to prolonged drug use, Mr. Guzman was even more susceptible to the perceived short-term benefits of criminal activity, with an impaired ability to contemplate the long term consequences of his actions.

3. Lack of Guidance Led Mr. Guzman to Make Poor Decisions

At the age of thirteen, Mr. Guzman was jumped into a gang. After witnessing the majority of his family, including his parents, be involved in a gang, his induction was a rite of passage. Mr. Guzman grew up surrounded by gangs and believed it was a normal way of life. However, being constantly surrounding by gangs caused Mr. Guzman to witness many traumatic events. Mr. Guzman has witnessed three of his friends pass away from gun violence. Mr. Guzman has also been the victim of gun violence four to five times. In addition to losing loved ones due to gang violence, Mr. Guzman has continuously witnessed many of his family members cycle in and out of prison, with some of his family members serving life sentences in prison. As a young, impressible child constantly surrounded by gang life, Mr. Guzman did not have a choice but to follow in his family's footsteps. Mr. Guzman's involvement in the gang led directly led to his involvement in the criminal justice system.

---

[3] *Id.*

[4] *Id.*

[5] *Id.*

**C. The Nature and Circumstances of the Offense (§ 3553(a)(1))**

This instant offense is a culmination of Mr. Guzman's addiction that has spanned the majority of his life. At the time of the instant offense, Mr. Guzman was using methamphetamine daily. It was under these circumstances that Mr. Guzman made the decision to distribute methamphetamine. While Mr. Guzman understands that this does not excuse his actions, it does put them in context.

**D. The Nature and Circumstances of the Offense (§ 3553(a)(2)): Deterrence, Just Punishment, and the Need to Provide Medical Care, Training, or Treatment.**

While the instant offense represents a lapse in Mr. Guzman's judgment, a sentence of 120 months' incarceration and 5 years of supervised release is sufficient to achieve the aims of sentencing. Mr. Guzman is now thirty-one years old. He is at the age in which an individual's criminal engagement declines. Research shows that crime starts to peak in the mid-to-late teenage years and begins to decline when individuals are in their mid-twenties.[6] After that, crime drops sharply as adults reach their thirties and forties.[7] In addition, Mr. Guzman recently became a father and wants to ensure that his children have the positive influences he lacked growing up. On November 29, 2020, Mr. Guzman's twins were born. Due to his incarceration, Mr. Guzman was not present for the birth of his children. Without his presence, his family is struggling financially, and Mr. Guzman wants nothing more than to be able to provide the stability he yearned for growing up. Further, for the first time, Mr. Guzman has a career path in mind. Mr. Guzman intends to go back to school to receive a bachelor's degree and eventually matriculate to law school. Mr. Guzman has researched programs that allow for

---

[6] *See Criminal Justice Facts*, The Sentencing Project, https://www.sentencingproject.org/criminal-justice-facts/ (last viewed September 13, 2021).

[7] *Id*.

incarcerated individuals to receive their bachelor's degree while in custody, and law schools that provide extra support for formerly incarcerated individuals. Mr. Guzman is determined to be a lawyer and help those who, similar to himself, found themselves in the criminal justice system due to a lack of guidance and the prevalence of negative influences. Studies show that life goals such as these correlate with a reduction in crime[8], and reduce the need for an extended period of incarceration. Moreover, the period of supervised release, coupled with Mr. Guzman's desire to become a law-abiding citizen, provides the needed assurance that Mr. Guzman will not commit further crimes.

## V. CONCLUSION

For the foregoing reasons, Mr. Guzman respectfully requests that the Court impose a sentence of 120 months' imprisonment and 5 years of supervised release. Based on the mitigating factors, such a sentence is sufficient, but not greater than necessary, to achieve the aims of sentencing in this case. Mr. Guzman also requests the Court recommends the RDAP program and that he be housed at a BOP facility in southern California.

Respectfully submitted,

CUAUHTEMOC ORTEGA
Federal Public Defender

DATED: March 4, 2022 By *<u>/s/ Ijeoma U. Eke</u>*

IJEOMA U. EKE
Deputy Federal Public Defender
Attorney for Joe Guzman

---

[8] Paul Atkinson, *Age and the Decline in Crime*, ASU News, April 16, 2013, https://news.asu.edu/content/age-and-decline-crime.